1  **BANNER LEGAL**
2  Jeremy C. Shafer (Bar No. 235318)
3  445 Marine View Ave., Suite 300
4  Del Mar, CA 92014
5  Tel: (888) 215-7834
6  Email: jshafer@bannerlegal.com
7
8  Attorney for Plaintiff
9
10              **UNITED STATES DISTRICT COURT**
11        **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
12

| | |
|---|---|
| GFC & SUPPLY INC., dba BIGPAPA BREAKS,<br><br>        Plaintiff,<br><br>    vs.<br><br>TIKTOK INC. and any successors in interest; BYTEDANCE INC.; BYTEDANCE LTD.; FANATICS, INC; NATIONAL FOOTBALL LEAGUE, AN UNINCORPORATED ASSOCIATION; NFL PROPERTIES LLC; NFL ENTERPRISES LLC; AND DOES 1–50, INCLUSIVE,<br><br>        Defendants. | Case No.:  2:25-cv-10054<br><br>**COMPLAINT FOR:**<br>**(1) Violation of Sherman Act §1 (Conspiracy in Restraint of Trade)**<br>**(2) Violation of Sherman Act §2 (Monopolization / Attempted Monopolization)**<br>**(3) Violation of Clayton Act §3 (Exclusive Dealing)**<br>**(4) Violation of California Cartwright Act**<br>**(5) Violation of California Unfair Competition Law (Bus. & Prof. Code §17200)**<br>**(6) Tortious Interference with Contractual Relations**<br>**(7) Tortious Interference with Prospective Economic Advantage**<br>**(8) False Advertising and Unfair Competition (Lanham Act §43(a))**<br>**(9) Common Law Unfair Competition**<br>**(10) Breach of Covenant of Good Faith & Fair Dealing**<br>**(11) Request for Injunctive Relief**<br><br>**JURY TRIAL DEMANDED** |

## I.    INTRODUCTION

1.    This case arises from a conspiracy among Defendants Fanatics, Inc. ("Fanatics"), the National Football League ("NFL"), NFL Properties LLC ("NFL Properties"); NFL Enterprises LLC ("NFL Enterprises") and ByteDance Inc. d/b/a TikTok and ByteDance Ltd. and TikTok Inc. ("TikTok"), to monopolize the sports memorabilia market, suppress competition, and destroy small business sellers known in the industry as "breakers."

2.    Beginning during the COVID-19 pandemic, a new class of small business entrepreneurs known as "breakers" transformed the sports memorabilia industry through innovative livestream "box breaks" on TikTok and similar platforms. These small, independent operators became a cornerstone of the modern collectibles' economy, driving billions in secondary-market sales and providing direct income opportunities for thousands of Americans and retired professional athletes who participated in autograph signings and memorabilia events.

3.    In 2021, Fanatics—backed by massive private equity funding from Silver Lake Technology Management, LLC ("Silver Lake") and with equity participation from the NFL and other sports leagues—embarked on a campaign to vertically integrate and ultimately monopolize the collectibles and memorabilia industry. Fanatics acquired exclusive licensing rights from the major sports leagues and players' associations, purchased the historic trading card manufacturer Topps,

and launched new internal brands such as Under Wraps, designed to dominate the autograph and memorabilia markets previously serviced by independent dealers and breakers.

4.      At the same time, Fanatics began consolidating control of digital sales channels. Leveraging its relationships with league owners, investors such as Silver Lake, and key technology partners, Fanatics developed its own live-commerce platform, Fanatics Live, while orchestrating restrictive distribution and reporting rules for hobby shops and breakers. These new rules, issued by Topps and Fanatics in 2023, effectively cut off supply to independent breakers and imposed unfair contractual conditions on anyone seeking to continue operations.

5.      Defendants TikTok, ByteDance Inc., and ByteDance Ltd. acted in concert with Fanatics and the NFL by suppressing or banning breakers who sold lawful, non-Fanatics memorabilia on the TikTok platform. TikTok's cooperation was not accidental: upon information and belief, the company saw dominance in the $40-billion-plus global sports collectibles market as an opportunity to enhance its own U.S. valuation in anticipation of a future sale or restructuring into American ownership.

6.      This conspiracy caused the systematic removal of thousands of legitimate small businesses from TikTok's commerce ecosystem, wiping out years of earned goodwill, algorithmic priority, and consumer trust. The exclusionary

conduct also eliminated key income sources for former NFL players and other professional athletes who once benefited from independent autograph signings and memorabilia appearances but were displaced by Fanatics' "exclusive" licensing and house-brand programs.

7.     Michael Rubin, Fanatics' CEO, and Silver Lake, one of its principal private-equity investors, are major architects and beneficiaries of this market consolidation. Their capital and strategic direction enabled Fanatics to leverage its licensing agreements with the NFL and its commercial influence with technology partners such as TikTok to erect artificial barriers to entry and destroy competition.

8.     As the result of Defendants' conduct and their co-conspirators' coordinated actions from 2020 through 2025—including Fanatics' acquisitions, the launch of Fanatics Live and Under Wraps, TikTok's bans of independent breakers, and the NFL's direct participation as an equity partner—Plaintiff lost millions of dollars in revenue, customer goodwill, and algorithmic seniority on TikTok.

9.     Plaintiff seeks damages, injunctive relief restoring its TikTok account with full algorithmic standing, declaratory relief voiding the coercive exclusivity imposed by Defendants, and such further equitable relief as this Court deems just and proper under federal and California law.

///

///

4

## II.    JURISDICTION AND VENUE

10.    This Court has jurisdiction under 28 U.S.C. §§1331 and 1337 (federal antitrust and unfair competition laws) and under 15 U.S.C. §§1, 2, 14, and 1125.

11.    Supplemental jurisdiction exists under 28 U.S.C. §1367 for Plaintiff's state law claims.

12.    Venue is proper under 28 U.S.C. §1391(b) because two of the primary Defendants' principal place of business is in this District, all the remaining Defendants transact substantial business in this District, and a substantial part of the events giving rise to this action occurred here.

## III.    PARTIES

13.    Plaintiff GFC & Supply Inc., doing business as "BigPapa Breaks," is an Ohio corporation engaged in the retail sale and live-stream marketing of sports memorabilia under the trade name BigPapa Breaks. Plaintiff's principal place of business is located at 12300 Kinsman Road, Newbury, Ohio 44065. GFC & Supply Inc. is duly organized and in good standing under the laws of the State of Ohio, and it brings this action on behalf of its business BigPapa Breaks for injuries sustained through Defendants' unlawful and anticompetitive conduct as alleged herein.

14.    Defendant Fanatics is a Delaware corporation with its principal place of business at 8100 Nations Way, Jacksonville, Florida. Fanatics is a global digital sports platform engaged in the manufacture, marketing, and sale of sports

merchandise and operates extensive e-commerce partnerships with major professional sports leagues, including the NFL. At all relevant times, Fanatics conducted substantial business within the State of California, including through online sales, marketing collaborations, and digital advertising campaigns directed to consumers in this District. Plaintiff alleges that Fanatics, acting in concert with the NFL and social-media platform TikTok, engaged in unfair trade practices and deceptive marketing tactics that misled consumers, distorted competition, and caused harm to Plaintiff's business and the public within the Central District of California.

15.    Defendant TikTok Inc. is a corporation organized and existing under the laws of the State of California, with its principal place of business located at 5800 Bristol Parkway, Suite 100, Culver City, California 90230. TikTok conducts business throughout the United States, including in this judicial district, through its operation of the TikTok social-media platform and related services.

16.    Defendant TikTok (collectively referring to the TikTok social-media and e-commerce platform operated and controlled by TikTok Inc. and ByteDance Ltd.) is an interactive online service and global content-sharing platform doing substantial business in the State of California and within this District. TikTok maintains and operates the U.S.-based version of its platform through its subsidiary TikTok Inc., under the ownership and control of ByteDance Ltd. At all relevant

times, TikTok acted through its agents, employees, and affiliated entities, including TikTok Inc. and ByteDance Ltd.

17.    Defendant ByteDance Ltd. is a private company limited by shares, incorporated under the laws of the Cayman Islands, with its principal executive offices located in Beijing, China.  ByteDance Ltd. is the global parent company that owns and controls the TikTok platform and related business operations worldwide, including within the United States. ByteDance Ltd. also maintains offices in the United States, Singapore, India, and the United Kingdom, among other locations.

18.    Defendant ByteDance Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 1199 Coleman Avenue, San Jose, CA 95110. ByteDance Inc. is a wholly owned subsidiary of ByteDance Ltd., a global technology company headquartered in Beijing, China. ByteDance Inc. conducts substantial business operations throughout the United States, including in this judicial district, by overseeing and managing various platforms and technologies, including but not limited to the TikTok social media platform. ByteDance Inc. is subject to the personal jurisdiction of this Court by virtue of its continuous and systematic contacts with the United States and this District.

19.    Defendant NFL is an unincorporated association comprised of thirty-two professional football clubs, with its principal offices located at 345 Park Avenue,

New York, NY 10154, with principal administrative offices in New York, New York. At all relevant times, the NFL conducted substantial business in California, including entering into marketing, licensing, and digital media contracts, and maintaining operations that target and reach consumers within the Central District of California. The NFL is a co-owner of Fanatics and benefits directly from Fanatics' market dominance.

20.    Defendant NFL Properties is a Delaware limited liability company with its principal place of business located at 345 Park Avenue, New York, New York 10154. NFL Properties is the commercial licensing and marketing arm of the NFL and is responsible for managing, licensing, and enforcing the League's trademarks, logos, and other intellectual property. NFL Properties acts as the central entity through which the NFL negotiates and administers licensing agreements with corporate partners and merchandise distributors, including Defendant Fanatics. At all relevant times, NFL Properties exercised substantial control over the distribution and commercialization of NFL-branded memorabilia and participated directly in the conspiracy described herein by coordinating with Fanatics and its investors to impose restrictive and exclusionary licensing practices on independent sellers and "breakers." NFL Properties conducts substantial business in the State of California and within this District through nationwide e-commerce operations, retail

partnerships, and licensing activities, and is therefore subject to the personal jurisdiction of this Court.

21.    Defendant NFL Enterprises is a Delaware limited liability company with its principal place of business located at 345 Park Avenue, New York, New York 10154. NFL Enterprises is the media, digital, and broadcasting subsidiary of the NFL and is responsible for the League's online, social media, and live-streaming initiatives, including commercial collaborations and promotional content distributed across platforms such as TikTok, YouTube, and other digital outlets. At all relevant times, NFL Enterprises coordinated with Defendants Fanatics, ByteDance Inc., ByteDance Ltd., and TikTok to promote Fanatics-exclusive content and merchandise through TikTok's e-commerce ecosystem and to implement or support restrictions that excluded independent sellers and breakers from the same digital marketplace. NFL Enterprises, acting in concert with NFL Properties and Fanatics, leveraged its media and digital influence to amplify Fanatics' exclusive control over NFL-licensed products and to suppress non-Fanatics memorabilia sales on social media platforms. NFL Enterprises conducts substantial business in the State of California and within this District, including operating digital media channels and interactive applications accessible to consumers in California, and is therefore subject to the personal jurisdiction of this Court.

22.    Doe Defendants 1–50 are presently unknown co-conspirators. Plaintiff will amend this Complaint to identify them when their identities are discovered. Plaintiff also includes as Defendants any successors in interest to the named Defendants.

## IV.    FACTUAL ALLEGATIONS

23.    Plaintiff GFC & SUPPLY INC., dba "BigPapa Breaks" is a memorabilia "breaker" based in Newbury, Ohio, operating live-stream sales of licensed sports memorabilia and collectibles acquired from independent distributors and former professional athletes.

24.    Plaintiff, like numerous other breakers, depended heavily on the TikTok platform (operated by Defendant ByteDance Ltd. And Defendant ByteDance Inc.) to reach fans and buyers. Over many years, Plaintiff developed a large follower base, accumulated algorithmic seniority, and engaged in frequent livestream sales.

25.    The sports memorabilia / collectibles industry is a high-value market. Publicly available market reports estimate the global sports memorabilia collectibles market at US $26.9 billion in 2024, with projections to US $42.1 billion by 2030. The U.S. sports collectibles market in particular is expected to grow at a compound annual growth rate of ~12.8%.

26.     Defendants—Fanatics, the NFL, and TikTok—entered into a concerted scheme to dominate this lucrative market by excluding independent breakers. A key component of that scheme was a planned IPO or sale of Fanatics at a stratospheric valuation, and TikTok's complicity was instrumental in supporting the strategy.

27.     As part owner (or partial equity interest) of Fanatics, the NFL stood to benefit directly from the value appreciation of Fanatics' proposed IPO or sale. The NFL used its licensing and branding leverage to pressure TikTok and others to align with Fanatics' exclusivity scheme.

28.     The NFL, acting through its commercial subsidiary NFL Properties, LLC, entered into and maintained a close financial and strategic partnership with Fanatics, including holding an equity interest in Fanatics that aligns the League's financial success with Fanatics' market dominance. By combining its role as the exclusive licensor of league marks with its position as an investor in Fanatics, the NFL created an inherent conflict of interest. The League's licensing policies and commercial strategies were no longer aimed at maximizing fair competition or player compensation but at inflating the value of Fanatics—its own portfolio company—at the expense of independent dealers, retired players, and small businesses such as Plaintiff.

29.     In cooperation with Fanatics Chief Executive Officer Michael Rubin and private-equity backer Silver Lake Technology Management, L.L.C., the NFL

facilitated a vertical integration of the sports-memorabilia industry that stripped competitors of access to licensed products. The League's endorsement and participation in Fanatics' exclusivity arrangements effectively foreclosed Plaintiff and other "breakers" from selling lawful NFL-branded collectibles unless those items were purchased through Fanatics' controlled distribution channels. The NFL's financial interest in Fanatics gave it a direct incentive to support these restrictive practices, despite their predictable effect of destroying open competition within the memorabilia marketplace.

30.    The NFL's cooperation also undermined its obligations under the Collective Bargaining Agreement ("CBA") with the NFL Players Association ("NFLPA"), which requires the League to preserve players' rights to license their names, images, and likenesses through fair and competitive means. By steering virtually all memorabilia licensing to Fanatics and its subsidiaries—such as "Fanatics Authentic" and "Under Wraps"—the NFL reduced opportunities for individual players, particularly retired or fringe players, to earn income from independent autograph signings and memorabilia appearances. This monopolistic structure diverted player-related revenues into the NFL-Fanatics enterprise while eliminating long-standing supplemental income streams that the CBA was designed to protect.

31.    Through these actions, the NFL knowingly participated in and benefited from a broader scheme to suppress independent commerce on social-media platforms, including TikTok, where thousands of breakers previously conducted legitimate business. The League's alignment with Fanatics and TikTok's enforcement of Fanatics-driven exclusivity rules resulted in widespread account bans, removal of live-selling privileges, and loss of algorithmic standing for small breakers such as Plaintiff. The League's conduct directly contributed to Plaintiff's exclusion from the digital marketplace and to the destruction of the competitive ecosystem that had flourished during the pandemic collectibles boom.

32.    As a proximate result of the NFL's cooperation with Fanatics and its disregard of its own collectively bargained duties, Plaintiff suffered severe economic damages, including the loss of millions of dollars in sales, irreversible de-ranking within TikTok's algorithm, and the collapse of customer goodwill built over years of lawful business activity. The NFL's participation in this scheme not only violated its obligations to the players whose likenesses it commercializes but also constituted a willful and unlawful restraint of trade that injured Plaintiff and similarly situated small businesses across the United States.

33.    TikTok became a willing conspirator. Internally, TikTok executives recognized the potential of leveraging dominance in the sports memorabilia niche to

help drive up valuation in connection with a future sale or IPO to American-based ownership, and thus had incentive to enforce Fanatics' exclusivity demands.

34.    Fanatics, in turn, sought to harness TikTok's powerful algorithmic reach to corner the entire market for licensed sports memorabilia. Fanatics anticipated that by controlling which sellers could access TikTok's audience, it could foreclose competition, lock in dominant pricing, and create a barrier to entry for new sellers. These actions would bolster its appeal in its anticipated IPO or sale as the undisputed platform for memorabilia commerce.

35.    Pursuant to this coordinated scheme, TikTok implemented and enforced exclusionary restrictions that banned or de-platformed independent breakers engaged in the lawful sale of sports memorabilia outside the Fanatics distribution channel, thereby suppressing competition, reinforcing Fanatics' exclusive control, and depriving consumers of meaningful competitive choice. These bans were not based on counterfeit or authenticity grounds but were enforced to implement Fanatics' exclusion strategy. TikTok circulated internal talking points (or allowed Fanatics to influence them) to falsely present Fanatics as the sole authorized source for NFL licensed merchandise, misrepresenting to consumers and to TikTok's moderation staff that other breakers had no rights to sell such items.

36.    ByteDance Inc., as the U.S. subsidiary of ByteDance Ltd., acted in concert with TikTok to control the American sports memorabilia market. Upon

14

information and belief, ByteDance Ltd. and ByteDance Inc. directed TikTok to ban breakers and independent sports memorabilia dealers in order to force them into exclusive contracts with Fanatics Inc.

37.   Fanatics Inc. falsely represented to Plaintiff, and others similarly situated, that it owned the intellectual property and copyright interests in NFL memorabilia, specifically Riddell Inc licensing rights to helmets and other on-field equipment, and that such ownership gave it the ability to demand bans on Plaintiff and others. These false representations and coordinated bans caused Plaintiff millions of dollars in financial harm.

38.   Riddell, Inc. ("Riddell") has served for decades as the official on-field equipment and consumer helmet licensee of the National Football League. Pursuant to a renewed licensing agreement executed in or about 2023, Riddell retains the exclusive right through 2030 to design, manufacture, and market authentic and replica NFL helmets and related headgear bearing official team marks. The license— administered through NFL Properties, a defendant herein—authorizes Riddell to supply helmets both for professional play and for commercial memorabilia purposes, including collectible and autograph editions widely used in the sports-memorabilia industry. Historically, these licensed helmets formed the core physical product used by breakers, memorabilia retailers, and autograph dealers to create authentic, league-approved merchandise for sale to fans and collectors.

39.     Prior to the Defendants' conspiracy, Riddell's helmets were a staple of the independent collectibles' ecosystem. Thousands of breakers, including Plaintiff, purchased Riddell full-size and mini-helmets through distributors or direct wholesalers, obtained player autographs, and sold them through live-streamed sales on TikTok and other platforms. These activities generated broad consumer engagement and secondary-market value for Riddell's products, reinforcing the prestige and profitability of Riddell's NFL license. By maintaining a diverse marketplace of sellers, Riddell benefited from continuous exposure of its branded helmets, which increased consumer demand and sustained royalty revenue for both Riddell and the NFL.

40.     Beginning in 2022, however, Defendants Fanatics, the NFL, and their digital co-conspirators TikTok, ByteDance Inc., and ByteDance Ltd., implemented a coordinated scheme to centralize all licensed memorabilia sales under Fanatics' control. Through Fanatics' acquisition of Topps, creation of its internal memorabilia brands "Fanatics Authentic" and "Under Wraps," and its exclusive distribution agreements supported by the NFL's ownership stake, Defendants intentionally suppressed independent breakers and diverted the memorabilia trade to Fanatics-controlled platforms. TikTok's subsequent bans and algorithmic demotions of breakers who sold non-Fanatics memorabilia destroyed a major retail outlet for

Riddell-licensed helmets, reducing overall demand and visibility for genuine Riddell products in the online marketplace.

41. The contraction of independent sales channels directly devalued Riddell's exclusive NFL license. Whereas Riddell once enjoyed broad downstream distribution through hobby shops, breakers, and independent signers, it now faces a narrower pipeline dominated by Fanatics' vertically integrated monopoly. Fanatics' prioritization of its own "in-house" memorabilia lines and mystery-box helmet products has diminished consumer recognition of Riddell as the authentic equipment brand of the NFL, eroding brand equity and consumer choice. The loss of independent breakers—previously a vital promotional network—has further depressed sales volume and royalties associated with Riddell's licensed helmets.

42. Although Riddell remains an official licensee in name, Defendants' collective conduct has substantially impaired the economic value of its exclusive rights. The unlawful boycott of independent breakers, such as Plaintiff, and the artificial consolidation of distribution have transformed Riddell's once-vibrant marketplace into a closed, Fanatics-controlled channel. This restraint not only inflicted millions of dollars in losses upon Plaintiff and similarly situated breakers who relied on Riddell products but also undermined the commercial foundation of Riddell's NFL license itself. By suppressing the competitive ecosystem that sustained demand for authentic NFL helmets, Defendants' actions have harmed both

license holders and small businesses, demonstrating the far-reaching anticompetitive effects of their conspiracy.

43.    In fact, at all relevant times, Riddell, Inc. held the exclusive NFL license through 2030 to manufacture, distribute, and market authentic and replica NFL helmets and related on-field gear. That license is administered by NFL Properties, which manages the League's commercial intellectual property portfolio.

44.    Riddell's license predates Fanatics' acquisition of memorabilia rights and continues to govern the helmet category across both retail and collectible markets. Thus, while Fanatics has broad merchandising rights, it does not own or control the NFL's intellectual property for on-field equipment such as helmets, which remains contractually vested in Riddell.

45.    Despite this clear delineation, Defendants Fanatics, TikTok, and NFL Enterprises jointly misrepresented to the public, to sellers, and to TikTok's platform moderators that Fanatics alone held exclusive rights to all NFL-branded merchandise, including helmets and on-field gear.

46.    These misrepresentations were communicated through TikTok's enforcement policies, moderator directives, and seller communications. Breakers who listed or displayed Riddell helmets, even if authentic and properly licensed, were told they were violating Fanatics' exclusive rights and were subsequently banned or demonetized.

18

47.    In reality, Fanatics had no such exclusive right—its agreements extended only to certain categories of fan merchandise, trading cards, and apparel, not to Riddell's long-standing helmet license.

48.    This constitutes a false statement of exclusivity, a form of market deception prohibited under both U.S. antitrust principles and unfair businesses practice statutes which prohibit dominant online platforms from misusing market power to self-preference or mislead business users regarding rights and market access.

49.    Part of the coordinated scheme was the pressure exerted by Fanatics Inc. in its offer to Plaintiff and others to "fix" the very problem Fanatics created— namely, Fanatics offered to use its influence with TikTok to have Plaintiff reinstated immediately, but only if it agreed to Fanatics' exclusive terms.

50.    Plaintiff's TikTok account, which had accrued significant engagement and algorithmic priority, was suspended and ultimately banned after Plaintiff refused to accede to Fanatics' demands. TikTok's algorithmic demotion is irreversible: even if reinstated, Plaintiff cannot recover the same priority or reach.

51.    TikTok further compounded the economic damage to Plaintiff, and others similarly situated, by getting rid of the assigned client representatives that helped individual breaker business become aware of, protest or appeal a violation before an actual ban caused permanent harm. Upon information and belief, this

safety valve (direct access to a TikTok account rep) was removed to prevent the amelioration of alleged violations to facilitate the banning of independent breaker businesses that competed with Fanatics' new live breaker product.

52.    Facing existential financial pressure following the ban, Plaintiff was coerced into signing an exclusive contract with Fanatics, under threat of permanent exclusion from TikTok and the broader fan marketplace. That exclusivity barred Plaintiff from selling any lawful memorabilia from independent sources or former players, effectively choking off its business model.

53.    The conspiratorial exclusion was not limited to Plaintiff. Dozens or hundreds of small breakers were similarly banned, coerced, or forced to accept Fanatics exclusivity. Competition in the memorabilia market collapsed; consumer choice narrowed; resale prices and collectible valuations were artificially controlled by Fanatics; and the presumed market value of collectibles held by independent breakers was depressed.

54.    Because Fanatics controlled preferential access to TikTok's audience, its ability to block rivals had systemic effect: new entrants in the memorabilia-selling space were foreclosed, and existing independent sellers lost critical distribution channels.

55.    The scheme's orchestration through TikTok's powerful algorithmic platform, combined with the NFL's licensing authority and equity interest,

demonstrates both vertical and horizontal integration among Defendants. The NFL's co-ownership of Fanatics aligns its financial incentives with suppressing competition and maximizing Fanatics' valuation at IPO or sale.

56. The combined effect is a group boycott, exclusive dealing regime, and monopolistic control over the licensed sports memorabilia market, which these Defendants deployed to maintain dominance, eliminate competition, and entrench their market power to support the anticipated Fanatics IPO or sale.

57. Plaintiff has suffered substantial harm: loss of revenue, loss of customer base, diminished goodwill, permanent algorithmic demotion, coerced contract terms, and suppression of its ability to compete on equal footing in the memorabilia market.

## V.   INJURY & DAMAGES

58. Plaintiff has sustained antitrust injury because the conduct of Defendants was directed not simply to harming Plaintiff individually but to restraining competition across the memorabilia industry. The scheme inflicted harm to competition and consumer welfare, and not only injury to one competitor.

59. NFL's equity interest (or co-ownership) in Fanatics gives it a direct financial stake in Fanatics' valuation. By aligning with Fanatics' exclusionary scheme, the NFL intervened to cause algorithmic bans and exclusion of breakers, thereby increasing the anticipated value of Fanatics in its proposed IPO or sale.

21

60.    TikTok, motivated by the opportunity to help drive up Fanatics' valuation and affirm its own dominance in the sports memorabilia sales niche, willingly colluded with Fanatics and the NFL. TikTok's suppression of rival breakers and preferential treatment of Fanatics merchandise was intended to help guarantee Fanatics' position as the sole dominant platform in the memorabilia space.

61.    The bans, algorithmic demotion, and forced exclusivity contracts caused Plaintiff to lose millions in sales and access to its following. Plaintiff's algorithmic seniority — built over years and at significant financial cost— is permanently impaired, and any reinstatement will not restore prior ranking or reach. This constitutes injury that is irreparable in nature.

62.    The forced exclusive contract deprived Plaintiff of autonomy to source from independent distributors or former players, locking it into unfavorable terms and excluding it from competing fairly in the memorabilia market.

63.    The scheme imposed market-level harm: competition was suppressed, consumer choice reduced, prices inflated by the monopolist, and independent sellers' collectible valuations weakened. These harms extend beyond Plaintiff to the memorabilia ecosystem.

64.    Plaintiff seeks damages in an amount to be proven at trial (including trebling under 15 U.S.C. §15), injunctive relief restoring its TikTok account with

full algorithmic seniority, cancelation of any coercive exclusive contract, and an order preventing Defendants from further anticompetitive conduct.

**COUNT I – VIOLATION OF SHERMAN ACT §1**
**AS TO ALL DEFENDANTS**
(15 U.S.C. §1 – Conspiracy in Restraint of Trade)

65.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

66.    Section 1 of the Sherman Act, 15 U.S.C. §1, prohibits contracts, combinations, and conspiracies that unreasonably restrain trade or commerce.

67.    Defendants Fanatics, the NFL, and ByteDance Ltd. entered into a contract, combination, or conspiracy to restrain trade in the U.S. sports memorabilia market, including live-streamed sales of licensed sports memorabilia.

68.    The object of the conspiracy was to exclude independent memorabilia sellers ("breakers") from TikTok unless they agreed to sell Fanatics' merchandise exclusively. The conspiracy was effectuated by:

a.    Banning breakers from TikTok who sold lawful memorabilia sourced from independent distributors or former professional athletes;

b.    Misrepresenting that Fanatics was the sole authorized source of NFL merchandise, when in fact Fanatics did not hold such exclusive rights;

c.    Coercing breakers into exclusive contracts with Fanatics under threat of permanent exclusion from TikTok; and

d.    Suppressing competition to inflate the market position of Fanatics and increase the valuation of both TikTok (ahead of an anticipated sale to U.S. ownership) and Fanatics (ahead of an anticipated IPO).

69.    The NFL, as part owner of Fanatics, had a direct financial stake in Fanatics' dominance and acted in concert with Fanatics to enforce exclusionary practices against competitors.

70.    TikTok became a willing conspirator because it sought to leverage its dominance in memorabilia live-streaming — a global collectibles market valued at over $26.9 billion in 2024 and projected to reach $42.1 billion by 2030 — to enhance its valuation in anticipation of a sale to U.S. owners.

71.    Fanatics sought to harness TikTok's control over consumer access and algorithmic placement to corner the memorabilia market, eliminate rivals, and secure monopoly pricing power in preparation for what is expected to be the largest IPO of a sports memorabilia company in history.

72.    The conspiracy constituted a group boycott and unlawful exclusive dealing arrangement, both of which are per se unreasonable restraints of trade under the Sherman Act, or, alternatively, unreasonable restraints of trade under the rule of reason.

73.    As a direct and proximate result of Defendants' unlawful agreement, Plaintiff and other breakers were excluded from the relevant market, deprived of

access to customers, coerced into unfair exclusive contracts, and permanently damaged in algorithmic standing and business reputation.

74. Plaintiff has suffered antitrust injury, including millions of dollars in lost revenue, lost goodwill, and lasting competitive harm.

75. Plaintiff is entitled to recover treble damages, costs of suit, and reasonable attorney's fees pursuant to 15 U.S.C. §15, and to injunctive relief prohibiting Defendants from continuing their unlawful restraint of trade.

## COUNT II – VIOLATION OF SHERMAN ACT §2
## AS TO ALL DEFENDANTS
(15 U.S.C. §2 – Monopolization / Attempted Monopolization)

76. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

77. Section 2 of the Sherman Act, 15 U.S.C. § 2, prohibits monopolization, attempted monopolization, and conspiracies to monopolize any part of trade or commerce.

78. Defendant Fanatics possesses monopoly power in the relevant market for licensed sports memorabilia in the United States, particularly in the rapidly growing live-streamed memorabilia sales segment. Fanatics controls the primary distribution channels for NFL merchandise and holds exclusive agreements that foreclose rivals from accessing consumers.

79.     Defendant NFL, as part owner of Fanatics, aligned its financial interests with Fanatics' strategy to maintain and expand monopoly power. By leveraging its licensing authority and co-ownership stake, the NFL provided Fanatics with the means to exclude competitors and solidify its dominance.

80.     Defendant TikTok, controlling one of the most powerful social commerce platforms in the world, became a willing participant in Fanatics' monopolization scheme. TikTok's motive was to enhance its own valuation in anticipation of an imminent sale to U.S. ownership by leveraging its role in a collectibles market valued at $26.9 billion in 2024 and projected to exceed $42 billion by 2030.

81.     Fanatics sought to use TikTok's platform dominance to corner the sports memorabilia market and position itself for what it publicly described as the largest IPO of a sports memorabilia company in history.

82.     Defendants engaged in exclusionary conduct designed to maintain and extend Fanatics' monopoly power, including:

a.      banning breakers who sold lawful memorabilia from independent sources or former players;

b.      coercing breakers into exclusive contracts with Fanatics;

c.      suppressing alternative sales channels by leveraging TikTok's algorithm to favor Fanatics' products; and

26

d.    spreading false statements that Fanatics was the sole authorized source of NFL memorabilia.

83.    These actions lacked legitimate business justification and were not designed to increase consumer welfare but to eliminate rivals and entrench Fanatics' market power.

84.    As a direct and proximate result of Defendants' conduct, Plaintiff and similarly situated breakers lost access to critical sales channels, lost millions in revenue, suffered permanent algorithmic demotion, and were unlawfully excluded from competing in the relevant market.

85.    Defendants' conduct harmed not only Plaintiff but also competition itself: consumer choice was reduced, market prices were artificially inflated, and the value of collectibles owned by independent breakers was unfairly depressed.

86.    Defendants' conduct constitutes monopolization, attempted monopolization, and conspiracy to monopolize, all in violation of Section 2 of the Sherman Act.

87.    Plaintiff is entitled to recover treble damages, costs of suit, and reasonable attorney's fees pursuant to 15 U.S.C. §15, and to injunctive relief restoring competition and prohibiting Defendants from continuing their exclusionary conduct.

///

## COUNT III – VIOLATION OF CLAYTON ACT § 3
## AS TO ALL DEFENDANTS
(15 U.S.C. §14 – Exclusive Dealing)

88.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

89.    Section 3 of the Clayton Act, 15 U.S.C. § 14, prohibits exclusive dealing arrangements that may substantially lessen competition or tend to create a monopoly in any line of commerce.

90.    Defendants Fanatics, the National Football League, and ByteDance Ltd. entered into and enforced exclusive dealing arrangements designed to foreclose competitors from the sports memorabilia market.

91.    The exclusive contracts imposed on breakers, including Plaintiff, prohibited them from selling sports memorabilia from any source other than Fanatics. These agreements extended to lawfully licensed merchandise obtained from independent distributors and former professional athletes, effectively choking off lawful competition.

92.    Defendants coerced Plaintiff and similarly situated breakers into signing such exclusive contracts under threat of permanent bans from TikTok, the dominant platform for live-stream memorabilia sales.

28

93.     TikTok, wielding its control over algorithmic visibility and consumer access, enforced these exclusivity demands by banning breakers who refused to comply and demoting them permanently in its recommendation system.

94.     The NFL, as part owner of Fanatics, provided licensing leverage to support Fanatics' exclusivity demands, aligning its financial interests with Fanatics' dominance and anticipated IPO valuation.

95.     The practical effect of these exclusive dealing arrangements was to substantially lessen competition and foreclose independent breakers from a critical percentage of the memorabilia market. TikTok's role as a leading live-stream commerce platform ensured that access to a significant portion of consumers was foreclosed to anyone outside Fanatics' exclusive network.

96.     Fanatics used these exclusivity provisions to entrench its monopoly power, inflate its valuation in anticipation of an IPO, and reduce consumer choice in the memorabilia marketplace.

97.     Plaintiff and other breakers were directly harmed by this scheme, losing millions of dollars in sales, suffering permanent algorithmic damage, and being deprived of the ability to lawfully compete in the sports memorabilia market.

98.     Defendants' conduct constitutes exclusive dealing arrangements that substantially lessened competition, in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14.

99.     Plaintiff is entitled to damages trebled under 15 U.S.C. § 15, costs of suit, reasonable attorney's fees, declaratory relief voiding the exclusive contracts, and injunctive relief prohibiting Defendants from enforcing further unlawful exclusivity.

**COUNT IV – VIOLATION OF THE CALIFORNIA CARTWRIGHT ACT**
**AS TO ALL DEFENDANTS**
(Cal. Bus. & Prof. Code §§ 16720 et seq.)

100.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

101.    The Cartwright Act, California Business & Professions Code §§ 16720 et seq., prohibits combinations of two or more persons to restrict trade, prevent competition, or control the supply or price of goods and services within the State of California.

102.    Defendants Fanatics, the NFL, and ByteDance Ltd., along with unnamed co-conspirators, entered into a contract, combination, and conspiracy to restrain trade in the market for licensed sports memorabilia and collectibles.

103.    The object of this conspiracy was to:

    a.     eliminate independent memorabilia sellers ("breakers") from TikTok;

    b.     force breakers, including Plaintiff, into coercive exclusive contracts with Fanatics;

c.    misrepresent Fanatics' rights as the sole authorized seller of NFL memorabilia; and

d.    suppress competition in the memorabilia market to inflate Fanatics' market share and valuation in anticipation of an IPO, and to increase TikTok's valuation in advance of its sale to U.S. ownership.

104.    Defendants carried out this conspiracy by banning breakers from TikTok who did not comply, demoting them permanently in TikTok's algorithm, and coercing them into exclusive dealing arrangements that foreclosed lawful competition.

105.    The NFL, as part owner of Fanatics, had a direct financial stake in ensuring Fanatics' dominance and participated in this scheme by leveraging its licensing power and aligning its commercial interests with Fanatics.

106.    The agreements and conduct of Defendants unreasonably restrained trade and substantially lessened competition within California by:

a.    foreclosing breakers from a significant percentage of California's sports memorabilia market;

b.    inflating consumer prices and reducing product choice;

c.    artificially suppressing the resale and collector value of existing memorabilia; and

d.    driving small California-based businesses, including Plaintiff, out of the market.

107.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered millions of dollars in lost sales, permanent reputational harm, loss of algorithmic standing on TikTok, and the inability to compete fairly in California's memorabilia market.

108.    Defendants' conduct constitutes a violation of the California Cartwright Act (Cal. Bus. & Prof. Code §§ 16720 et seq.)

109.    Plaintiff seeks damages trebled under Cal. Bus. & Prof. Code § 16750(a), restitution, injunctive relief prohibiting Defendants from further anticompetitive practices, and reasonable attorney's fees and costs.

**COUNT V – VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW AS TO ALL DEFENDANTS**
(Cal. Bus. & Prof. Code § 17200 et seq.)

110.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

111.    The California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 et seq., prohibits any unlawful, unfair, or fraudulent business act or practice.

112.    Unlawful Prong.

Defendants engaged in conduct that constitutes violations of federal and state antitrust law, including the Sherman Act §§ 1–2, the Clayton Act § 3, and the Cartwright Act. These violations serve as predicate acts of "unlawful" conduct under the UCL.

113.   Unfair Prong.

Defendants' conduct was unfair in that it:

a.   excluded independent breakers, including Plaintiff, from participating in the sports memorabilia market on TikTok;

b.   coerced Plaintiff into an exclusive contract with Fanatics under threat of permanent exclusion;

c.   inflated consumer prices, reduced consumer choice, and suppressed the value of lawful memorabilia; and

d.   permanently demoted Plaintiff and similarly situated breakers in TikTok's algorithm, causing enduring competitive harm.

These practices offend established public policy, were immoral, oppressive, and substantially injurious to consumers and competitors.

114.   Fraudulent Prong.

Defendants made false and misleading statements to consumers and breakers by representing that Fanatics was the sole authorized seller of NFL memorabilia, when in fact Fanatics did not hold such exclusive rights. These misrepresentations

were likely to deceive the public and did deceive consumers, who were led to believe that non-Fanatics sellers were unauthorized or illegitimate.

115.   Defendant NFL, as part owner of Fanatics, had a direct financial interest in supporting these unfair practices and provided licensing leverage to enable Fanatics' exclusivity.

116.   Defendant TikTok willingly conspired in this scheme, motivated by its interest in bolstering its valuation in anticipation of a sale to U.S. ownership, and used its platform dominance to exclude competitors and support Fanatics' IPO ambitions.

117.   As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent business practices, Plaintiff suffered millions of dollars in lost revenue, reputational damage, loss of algorithmic seniority, and coerced contractual obligations.

118.   Plaintiff seeks restitution of lost money and property, injunctive relief prohibiting Defendants from continuing these practices, declaratory relief voiding the coerced contract, and attorney's fees and costs pursuant to Cal. Code Civ. Proc. § 1021.5.

///

///

## COUNT VI – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS AS TO ALL DEFENDANTS

119.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

120.    Plaintiff had valid and enforceable contracts with customers, suppliers, and distributors to sell sports memorabilia, including lawful and licensed products obtained from independent distributors and former professional athletes.

121.    Defendants had knowledge of Plaintiff's contractual relationships. By virtue of their role in the memorabilia market and through their monitoring of TikTok activity, Defendants knew or should have known of Plaintiff's reliance on these contracts and ongoing sales relationships.

122.    Defendants intentionally and unjustifiably interfered with these contracts by:

a.    banning Plaintiff's TikTok account, thereby severing access to customers with whom Plaintiff had contractual and repeat-purchase relationships;

b.    coercing Plaintiff into an exclusive contract with Fanatics, which directly conflicted with Plaintiff's preexisting contracts with independent distributors and sellers; and

c.    spreading false statements that only Fanatics merchandise was "authorized," undermining Plaintiff's legitimacy in the eyes of customers and suppliers.

123.    The NFL, as part owner of Fanatics, provided licensing leverage and financial backing to support Fanatics' scheme, knowing that it would destroy Plaintiff's existing contracts and customer relationships.

124.    TikTok, motivated by its interest in boosting its valuation ahead of a U.S. sale, willingly cooperated in banning Plaintiff and other breakers, fully aware that such bans would rupture their contractual relationships.

125.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff's contracts with distributors and customers were breached or disrupted.

126.    Plaintiff has suffered millions of dollars in damages, including lost revenue from terminated contracts, diminished goodwill, and long-term competitive harm.

127.    Defendants' conduct was intentional, malicious, and carried out with conscious disregard for Plaintiff's rights, thereby entitling Plaintiff to compensatory and punitive damages under California law.

///

///

///

**COUNT VII – TORTIOUS INTERFERENCE WITH PROSPECTIVE**
**ECONOMIC ADVANTAGE**
**(AS TO ALL DEFENDANTS)**

128.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

129.    Plaintiff had ongoing and reasonably probable economic relationships with customers, fans, and business partners who regularly purchased sports memorabilia through its TikTok live-stream sales. These relationships had a high probability of producing future economic benefits for Plaintiff.

130.    Defendants knew of these ongoing economic relationships. By monitoring TikTok sales channels and implementing bans targeted at breakers, Defendants were fully aware that Plaintiff's customer base and future revenue depended on continued access to the TikTok platform and its ability to sell lawful memorabilia.

131.    Defendants intentionally engaged in wrongful acts designed to disrupt Plaintiff's economic relationships, including:

a.    banning Plaintiff's TikTok account, which permanently severed access to existing and prospective customers;

b.    coercing Plaintiff into signing an exclusive contract with Fanatics, which foreclosed opportunities to sell products from other lawful sources, including former professional athletes and independent distributors;

c.    spreading false representations that only Fanatics products were "authorized," thereby undermining Plaintiff's reputation and consumer confidence; and

d.    conspiring to monopolize the memorabilia market in order to inflate TikTok's valuation ahead of its sale to U.S. ownership and Fanatics' valuation ahead of its IPO.

132.    The NFL, as part owner of Fanatics, participated knowingly in these actions to support Fanatics' market control, despite knowing the harm that would be inflicted on small businesses like Plaintiff's.

133.    TikTok, motivated by its own valuation goals, willingly enforced the bans and exclusionary practices to support Fanatics' IPO ambitions, fully aware that such acts would destroy Plaintiff's prospective relationships with consumers.

134.    As a direct and proximate result of Defendants' intentional interference, Plaintiff's prospective economic relationships were disrupted, causing Plaintiff to lose millions of dollars in future revenue, customer goodwill, and market position.

135.    Plaintiff has suffered damages in the form of lost profits, diminished goodwill, and reputational injury.

136.    Defendants' conduct was intentional, malicious, and carried out with conscious disregard for Plaintiff's economic interests, entitling Plaintiff to compensatory and punitive damages under California law.

## COUNT VIII – FALSE ADVERTISING & UNFAIR COMPETITION
## AS TO ALL DEFENDANTS
### (Lanham Act §43(a), 15 U.S.C. § 1125(a))

137.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

138.   Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), prohibits false or misleading representations of fact in commercial advertising or promotion that misrepresent the nature, characteristics, qualities, or origin of goods or services, and prohibits unfair competition through such misrepresentations.

139.   Defendants Fanatics, the National Football League, and ByteDance Ltd. made and disseminated false and misleading representations of fact in interstate commerce, including through TikTok's platform, to consumers, breakers, and the public.

140.   Specifically, Defendants misrepresented that Fanatics was the sole authorized source of NFL memorabilia sold on TikTok, and that breakers like Plaintiff who sold memorabilia obtained from independent distributors or former professional athletes were "unauthorized" or "illegitimate."

141.   These statements were materially false and misleading because Fanatics did not possess exclusive rights to all NFL memorabilia, and independent sellers lawfully obtained and resold such items.

39

142.    Defendants made these false statements in commercial advertising and promotion with the intent to mislead consumers into believing that only Fanatics' products were authentic, thereby diverting sales and goodwill away from Plaintiff and similarly situated breakers.

143.    The NFL, as part owner of Fanatics, had a direct financial interest in promoting these misrepresentations and knowingly supported Fanatics' strategy to exclude independent competitors.

144.    TikTok, as a willing conspirator, disseminated these misrepresentations through its platform policies, moderation practices, and consumer-facing communications, motivated by its goal of increasing its valuation ahead of a U.S. sale.

145.    These false statements actually deceived or had a strong tendency to deceive a substantial segment of consumers, who reasonably believed that Fanatics was the only authorized seller of NFL memorabilia on TikTok.

146.    Plaintiff has been and continues to be injured as a direct and proximate result of Defendants' false and misleading representations, including the loss of millions of dollars in sales, damage to its reputation, diminished consumer trust, and permanent impairment of its business standing in the memorabilia market.

147. Defendants' conduct constitutes false advertising and unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

148.    Plaintiff is entitled to damages, including Defendants' profits, treble damages for willful misconduct, injunctive relief prohibiting further false advertising, and attorney's fees and costs.

## COUNT IX – COMMON LAW UNFAIR COMPETITION
## AS TO ALL DEFENDANTS

149.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

150.    Under California common law, unfair competition is broadly defined to include unlawful, unfair, or fraudulent business practices, as well as acts of "passing off," misappropriation, and other practices by which one business wrongfully interferes with another's ability to compete fairly.

151.    Defendants Fanatics, the National Football League, and ByteDance Ltd. engaged in unfair competition by conspiring to exclude Plaintiff and other independent memorabilia sellers ("breakers") from TikTok's marketplace, coercing breakers into exclusive contracts with Fanatics, and disseminating false statements to consumers that only Fanatics products were authorized or legitimate.

152.    These acts were undertaken for the purpose of destroying lawful competition, inflating Fanatics' market position ahead of its anticipated IPO, and increasing TikTok's valuation ahead of its planned sale to U.S. ownership.

153.   The NFL, as part owner of Fanatics, had a direct financial stake in supporting this unfair scheme, leveraging its licensing power to foreclose rivals and entrench Fanatics' dominance.

154.   TikTok willingly aided Fanatics and the NFL by enforcing bans, permanently demoting breakers in its algorithm, and providing a platform for Fanatics' false exclusivity claims.

155.   Defendants' acts of unfair competition were wrongful, unjustified, and contrary to public policy favoring open and competitive markets.

156.   As a direct and proximate result of Defendants' conduct, Plaintiff has suffered millions of dollars in lost sales, damage to its reputation, the destruction of customer goodwill, and the loss of its algorithmic seniority and business standing in the sports memorabilia marketplace.

157.   Defendants' conduct constitutes common law unfair competition under California law.

158.   Plaintiff seeks compensatory damages, restitution, injunctive relief preventing Defendants from continuing their unfair competition, and punitive damages for Defendants' willful and malicious conduct.

///

///

## COUNT X – BREACH OF COVENANT OF GOOD FAITH & FAIR DEALING
## AS TO ALL DEFENDANTS

159.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

160.   Plaintiff maintained a contractual relationship with Defendant ByteDance Ltd. through TikTok's platform terms of service and commercial account agreements, which governed Plaintiff's ability to operate a breaker business and sell sports memorabilia through TikTok's live-stream marketplace.

161.   Every contract under California law contains an implied covenant of good faith and fair dealing, requiring each party not to act in bad faith or unfairly interfere with the other party's right to receive the benefits of the agreement.

162.   Plaintiff reasonably expected that TikTok would provide access to its platform in good faith, apply its rules fairly and consistently, and not engage in arbitrary or conspiratorial conduct designed to favor one competitor over another.

163.   TikTok breached the covenant of good faith and fair dealing by:

a.    arbitrarily banning Plaintiff's account despite Plaintiff's compliance with applicable laws and the lawful sale of licensed memorabilia;

b.    conspiring with Fanatics and the NFL to exclude Plaintiff and other breakers from the marketplace;

43

c.    misrepresenting that only Fanatics merchandise was authorized, thereby undermining Plaintiff's legitimate sales; and

d.    permanently demoting Plaintiff's algorithmic ranking, effectively destroying its ability to regain the benefits of its contract even if reinstated.

164.  These actions were taken in bad faith, were not supported by any legitimate contractual purpose, and were motivated by TikTok's desire to bolster Fanatics' market position in anticipation of Fanatics' IPO and to inflate TikTok's own valuation ahead of its anticipated U.S. sale.

165.  As a direct and proximate result of TikTok's breach of the implied covenant, Plaintiff lost millions of dollars in revenue, suffered reputational harm, lost customer goodwill, and permanently lost the algorithmic seniority that formed the foundation of its business on TikTok.

166.  Plaintiff seeks compensatory damages for its losses, restitution, declaratory relief restoring its account with algorithmic seniority, and punitive damages based on TikTok's willful and malicious conduct.

## COUNT XI — REQUEST FOR INJUNCTIVE RELIEF
## AS TO ALL DEFENDANTS

167.  Plaintiff realleges and incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

168. Defendants' conduct, as described above, has caused and will continue to cause Plaintiff irreparable harm for which there is no adequate remedy at law.

169. Unless enjoined by this Court, Defendants will continue their unlawful acts harming Plaintiff (and those similarly situated) by engaging in the following unlawful acts:

a. Allowing Fanatics to unlawfully and wrongfully allege Trademark and Copyright violations on social media and online sales platforms resulting in violations and permanent bans.

b. Unlawful and wrongful Gamblification violations (allegations of gambling) resulting in violations and permanent bans.

c. Targeting companies like Plaintiff who compete with Fanatics in selling sports memorabilia with automatic suspension of social media and online sales accounts without notice or due process.

d. Having other Defendants or their agents reach out to Plaintiff to demand that the only way to reinstate their accounts is to sign exclusive distribution contracts with Fanatics Inc. at above market rates.

e. Unlawfully diminishing and/or outright destroying the value of existing independently sourced, genuine, licensed, and PSA graded sport memorabilia.

f.    Refusing to restore the Plaintiff to their previous algorithmic placement in the sports memorabilia sellers hierarchy even if they agree to the extortion tactics;

g.    All of which result in continued and irreparable injury to Plaintiff.

170.    Plaintiff has a substantial likelihood of success on the merits of the case, will suffer irreparable harm in the absence of injunctive relief, and the balance of equities and public interest favor granting such relief.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

a.    Issue a preliminary injunction restraining Defendant, its officers, agents, employees, and all persons acting in concert with it, from continuing the wrongful acts described herein during the pendency of this action;

b.    Issue a permanent injunction upon final judgment enjoining Defendant from engaging in the unlawful conduct alleged in this Complaint;

c.    Award Plaintiff reasonable attorneys' fees and costs as permitted by law; and

d.    Grant such other and further relief as this Court deems just and proper.

## VI.    PRAYER FOR RELIEF

Plaintiff requests that the Court:

171. Award damages in an amount to be proven at trial, trebled under federal antitrust laws.

172. Order reinstatement of Plaintiff's TikTok account, with restoration of prior algorithmic priority.

173. Declare Fanatics' exclusive contract unenforceable and void as against public policy.

174. Issue injunctive relief preventing Defendants from engaging in future anticompetitive conduct.

175. Award attorney's fees and costs pursuant to 15 U.S.C. § 15 and Cal. Bus. & Prof. Code § 17200.

176. Grant such further relief as the Court deems just and proper.

## VII.    DEMAND FOR JURY TRIAL

177. Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

/s/ Jeremy C. Shafer

Dated: October 20, 2025

Jeremy C. Shafer, Bar No. 235318
**BANNER LEGAL**
445 Marine View Ave., Suite 300
Del Mar, CA 92014
Tel: (888) 215-7834
Email: jshafer@bannerlegal.com

*Attorney for Plaintiff*